Yes. Go right ahead. Good morning, Your Honors. My name is Yilin Pun. I'm the attorney for Ms. Zhao, the appellant. With me today is Debra Niedermeyer from my colleague from Seattle. I'm from the East Coast. Good morning, Ms. Niedermeyer. May I please the court? Ms. Zhao is a Chinese citizen. She's college educated. Her major was in English language education. She's from the Wenzhou area near Shanghai in the Zhejiang province. The case involves the fact that she has been ordered to submit to a virginity inspection, which required all women of childbearing age over the age of 18 in her area. She opposed to this inspection, and they resisted by not showing up and then leaving China. She opposed the inspection because she regarded the inspection as very offensive and degrading to women, as well as dangerous to her health. Also, because she knew that she failed the inspection, she would be humiliated by having the result publicly announced in order to shame her. And she would be forced to submit to an IUD inspection. She also testified that she opposed to the inspection because she opposed to the coercive family planning policy, as is implemented by the Chinese government, and probably because of what they have done to her mother by sterilizing her. Lastly, she also objected to the inspection because she explained that she objected to the many ways that Chinese women have been treated by the Chinese society, have been mistreated, actually. And she saw the virginity inspection as one of these mistreatments directed at women. The facts in this case are not in dispute. Lastly, also as a result of her resistance in the form of noncompliance, the family has been fined 1,500 yen, which is about 30% of the average annual income of a rural household in China. And she also has been threatened with the insertion of an IUD. The facts in this case are not in dispute, and credibility is not an issue. The case involved purely legal issues. The court is asked to decide three legal issues today. One, whether the mandatory quarterly virginity inspection as Ms. Chow described it constitute persecution. Two, whether the threat of a forcible IUD insertion creates for Ms. Chow a well-founded fear of future persecution. Three, whether Ms. Chow has a well-founded fear of forced abortion and forced sterilization, given the fact that her mother and other relatives have been sterilized forcibly by the Chinese government, and she indicated that she wants to get married and have children, and also given all the information contained in the background country condition report. And I would like to defer to my colleague, Debra Niedermeyer, on some of the legal issues. Are you abandoning your claim under the Convention Against Torture? We are, but that will not be our primary focus today. I'm not sure I understood the last answer. So you're just not going to argue it, but you're not conceding it? Right, we will not argue it, but we're not conceding it. All right. Correct. Thank you. Ms. Niedermeyer? Good morning. The first question to be answered is whether the virginity inspections constitute persecution. The controlling case in this matter is Lee versus Ashcroft. In Lee, the applicant had actually experienced the persecution that Ms. Chow fears. We didn't go quite that far in Lee, did we? We didn't declare that the fact of the inspection program was persecution. It was, as I read that opinion, wouldn't you agree it was the offensive, prolonged medical examination that she was forced to endure? But that is what Ms. Chow fears. Yes. You understand, she has not undergone this. She has run away from it. If, right, she, and we don't require that people who have a well-founded fear of persecution stay, be persecuted, and then run away. But I guess what I heard you arguing, and maybe I'm cutting the hairs too finely here, is the mere fact that the Chinese government has a population control policy is not sufficient under our case law. Is it for us to declare that the very existence of the policy is abhorrent to American notions of? No, Your Honor. All right. But I want to be clear. What Ms. Chow fears is pretty much exactly what happened to Ms. Lee. Perhaps the difference between Ms. Lee is that Ms. Lee went around her village saying, I'm underage. I'm going to have babies with my boyfriend, and you're not going to stop me. And she was grabbed because of that. That, Ms. Chow has not done. She instead has run away. If she were returned, she would kick, scream, fight, and undergo that same kind of half-hour inspection that Ms. Lee had not. Well, counsel, I mean, we hear a number of these cases. And it's been my experience, and I think our case law reflects this, that it really depends on what part of China you're talking about, doesn't it? Yes, it does. And this is interesting because. Well, based on that concession, then how can we speculate in the face of a cold record here because it hasn't happened to this alien? No, it happens in her area. OK. It happens in her area routinely. It does not happen in Ms. Lee's area routinely. Let me defer to my colleague. All right. Your Honor, there is in the background both a profile, 1995 profile, and also a 1998 profile submitted by the US government, compiled by the US government, specifically mentioned the Wen Zhao area. No other area has been mentioned that get marching orders to inspect and detect pregnancy prior to the foreman's maturity. And there's also every woman over 18 has to show up for a quarterly gynecological checkup, what they call examination. And it's specifically mentioned in this profile. So you would say, based on that statement in the State Department report, that this is an area where the policy is aggressively enforced as opposed to other areas? Correct. In fact, in 1985, according to the background, they considered it a disaster area there. And then in 1991, the Chinese government instituted something called the Responsibility System, which mandates all the local officials to fulfill targets for abortion and sterilization. If they fail to meet the target, they lose their job, and they would be demoted. They lose bonuses. And that's why, since 1992, this program has been aggressively instituted so that it would not become a disaster area. Let me ask you a practical question that is referenced in some of the cases that I read in preparation for the argument today. There is a reference to some sort of a cap on the number of asylum claims that the Attorney General grants for this reason of 1,000. The Real ID Act has abolished. As signed by President Bush on May 11, has abolished this cap. That means that for people that doesn't matter what basis they have an asylum, based on 601, they have no more cap. So there's not a worry about whether she's going to be using up one of the 1,000 numbers available to these applicants. So is there no limit as far as you understand? No limit anymore at all. The other issue is that, other than just the fact because it's a family planning policy, there is a political opinion that she articulated that she opposed to it because of how she looked at this as the whole thing, how Chinese women has been degraded. The fact that she's a college educator because she majored in English, maybe the exposure to her about Western literature, Western society, may be a factor into why she has to feel that she need to object to it, and she resisted. Counsel, if the policy is aggressively enforced in some areas of China and not in other areas of China, then can she go back to China but not return to her particular state? And is that satisfactory? Not really, Your Honor. There is a household registration system enforced in China. And that's the reason why even though she was in college at that time, for the years she was in college, she was able to avoid it. But the minute she finished college and finished the internship training, the household registration system worked like a cash system that she had to go back to where she came from. She's not free to move as we understand it in Western society. So all those cases, primarily out of Central and South America, where we say, well, maybe they're not safe in that part of the country, but they can go live at the capital, that wouldn't apply in China? It would not apply at all. She wouldn't be allowed to do that? She would not be allowed to move as she wished. Thank you. Ms. Dienerbauer, you want to continue? This is like a relay race, passing the baton back and forth. We work together like this. That's all right. We're pretty flexible. Any way you want to do it is fine with us. So this is both, as Ms. Poon mentioned, this is both resistance to other persecution under the coercive family planning laws. It's also social group persecution of young women of childbearing age, not married, it doesn't matter whether they're married or not, in this Wenzhou area, the Zhejiang area. Li, by the way, is from Fujian province. And the reason she was subjected very particularly to that inspection was because of her running around pointing herself out. Ms. Zhao has not done that. Instead, she ran away hearing what her sister had gone through. Well, there isn't any question under our case law now that if we find that this amounts to, that these policies as implemented amount to persecution, that is persecution on grounds of political opinion under NYSERDA's case law. Yes, it is, Your Honor. But it is also, we say, social group persecution. And you see that most clearly. Does it matter? I mean, it doesn't. Sometimes people do worry about that. It doesn't matter to us. But we do want to point out that persecution can be in a couple different ways for a couple different reasons. And this is on account of political opinion. And it's also on account of social group. You see that most clearly in the Mohamed case, the most recent Mohamed case, which is a female genital mutilation case, whereas this is genital inspection case is what it is. We'd like to make the point that because this inspection, even not getting to the IUD, which she's been threatened with, even this inspection is serious sexual assault under U.S. law. And we do have in the Mohamed case this Court recognizing that what is criminal in U.S. law is relevant, I mean, not determining, but relevant to what we see as persecutory in the persecution context overseas. Female genital mutilation is criminal in this country. Sexual assault of the kind that is proposed, she's been ordered to submit to a hymen inspection. She's been threatened with IUD insertion, which is rape, rape-like, as Lee said. Roberts, if we were to agree with your position and grant the petition, you're asking for us to send this back to the Attorney General for an exercise of discretion, is that right? Yes. Okay. Then we believe that because the facts are not in dispute, it's clear that the virginity inspection would happen if she went back. The issue about the virginity inspection and probably the IUD which she's been threatened with is that persecution. As far as the sterilization and forced abortion that Ms. Zhao fears, that is a question of, she's afraid of it. We understand that from her testimony. Is that fear well-founded? What we say is, yes, it is. First of all, she's got the family history of seeing what her mother went through. That that this Court has toyed with and then rejected the idea that that might automatically entitle her to asylum. It doesn't automatically entitle her, but it's definitely relevant. And we came pretty close, didn't we, in the case where we granted the husband's petition on the basis of her wife? Yes. It came by the name of the case. ZYC. What is that? ZYC. ZYC. I was the attorney record for that. Oh, all right. I thought I recognized you. Yes, that's the tight relationship situation that this Court has toyed with automatic persecution. Let me also add to the fact that when we talk about Wen Zhao and Zizan, according to the government's report, both reporting 95 and 98, 20 percent of women with one child has been sterilized and 70 percent of people, women with two children, have been sterilized. Ms. Poon is saying 70. 70, 7-0. 7-0. So it's more than even a reasonable fear. It's more likely that she'll be sterilized as soon as she becomes pregnant and has children. And in the circuit, we've got very strong language that you don't have to even have a probability of persecution. Even 10 percent is enough. There's no reason. There's no reason at all to think that Ms. Zhao will not marry and have children. This is the normal course for a Chinese woman. And 20 percent of women who have had children are sterilized. 70 percent of women with two children. The sterilization is almost all, because of cultural reasons, for and you'll see this in the record, on the women, not very little on the men, changing perhaps. That says nothing of the abortions that these women are subject to for sterilization, which we do not have statistics on because it's so hard to get hold of. But we do know they're very common. We only have statistics on the sterilization. Therefore, we feel that with abortion and sterilization, it's per se persecution. She has a well-founded fear of it, if only because of the statistics. And again, the Muhammad case tells us that the more widespread it is, and Lo Long, the Indonesian case as well, recently, the more widespread it is, the more reasonable her fear is. We feel that her fear of even the per se persecution of sterilization and abortion is well-founded. And that is on account of political opinion. Now, as far as the social group persecution, you have to keep in mind that there really is a social group persecution specifically of childbearing women in China, and it comes out in a female suicide rate. You'll see this in the background, of five times the world rate. And we'll reserve the rest for everybody. Very well. Thank you both. That's very, very informative. May it please the Court. Donald Coo, the Honorable, the Respondent. Your Honors, there is only one claim here properly, in spite of what you've been told, and that is a fear of persecution on account of a gynecological examination. This case did not concern a fear of sterilization or abortion, and it does not now concern past persecution. Nor is it about, we are told for the first time, so-called virginity inspections. The case is factually unique because we have a petitioner who is, on the one hand, found credible, but the only evidence that she proffers and that she relies upon for her stated fear is information from one of her elder sisters, who at the time this claim was made, had not been to China in at least six years. Are you denying that this particular region in China has these policies? And the fact that she got this information from her sister doesn't mean that the information is, are you claiming that the information is now hearsay and that the Court shouldn't rely on that? If I may answer it this way. She's, if you look at it carefully, not complaining about a population control policy and examination. She's complaining about the conditions of that examination. And that's not cutting it too fine. That's exactly what she complained about. You mean if there was more privacy in the conduct of the examination, she wouldn't have this objection? That's her objection based on what her sister told her. And the three times she proffered those facts, on all of those occasions she said, my sister told me or my elder sister told me, no privacy, not hygienic, and it could hurt my reputation in the village. It's a small village. Word gets around. That's what she's complaining about. She's not saying that. Well, wait a minute. Why is broadcasting the fact of whether you're a virgin or not to the village, why is that described a condition of the gynecological exam? That's actually broadcasting the results of the exam. And that doesn't seem to fit with your theory. May I ask in what way, Your Honor? Well, you're arguing that her only objection is to the fact that they don't use sterile procedures in the gynecological exam, that she's not actually arguing about the fact of the gynecological exam. And if she is complaining about the fact that the results of the exam are broadcast to her village, that seems to extend far beyond the bounds of your argument. You said sometimes they were, and she's concerned about her reputation. Well, does she have a right to be concerned? Well, of course. But that's just village talk. That's not part of a policy, a population control policy. Shaming is not part of the policy? There's no authority to shaming as part of the policy. That's correct. Are you disputing the fact as to whether people are shamed in this way? Are you claiming that she's not credible when she says that people in her village are shamed in this way? She gave examples where people were shamed. But she did not say that this was part of the policy, this was routinely done. It's something that sometimes happened. But why does that make her fear unreasonable, if there's evidence in the record that it actually does occur? Isn't that sufficient? It's not sufficient. Why not? I mean, is the government now taking the position that unless it's actually happened to her and she can personally testify that she has suffered these forms of persecution, then we must rule as a matter of law that objectively she has no reasonable fear of mutual assault? No court has yet said that a gynecological examination is per se persecution. But we came pretty close in Lee based upon the admittedly severe manner in which the examination was carried out, didn't we? No. You don't think we did? I don't think you did, Your Honor. Lee is as far apart from this case as day is from night. There's nothing to compare that case with this one other than the fact that it involved a gynecological procedure. What happened in Lee could have been decided without any reference to the Population Control Amendment. It was clearly a retaliatory, punitive, excessive act by officials based on her taunting and defying them. So you would liken it almost to a form of torture? It could approach that. But it was certainly assaultive, and in time, duration, intensity, it was just beyond anything that should or could have occurred if it were just a routine examination. And then, of course, you had the conduct of Miss Lee that counted for something. And in this case, there's nothing to compare it. That was about past persecution. It was about the first sentence in the Population Control Amendment, which includes language about other resistance to a control program. This is about fear. And that language is not in the second sentence of the amendment. Counsel, if we disagree with you on your interpretation that Lee is day and night from this case, should we remand to the Board for reconsideration of its opinion in light of Lee, which came out after the Board's opinion, or should we remand to the Attorney General for an exercise of discretion? Well, discretion would be something else. If the Court were to grant the petition, yes, the remand would be for that. But I don't think there's a need for a remand on if you look at what was decided. The fact finder made a legal determination that what she feared does not rise to the level of persecution. And the fact finder also said that you did not present evidence which was sufficient enough to sustain a well-founded fear of persecution. We had a whole series of cases, including Lee, but there were others that came out in 2004 after the Board issued its opinion. Yeah, what do you do about Chen, which came out in 2004 and is one of the cases that's been filed? In the Ninth Circuit, Your Honor? Yeah. Help me just a little bit. There's so many Chans and Lees. Chen was a case where it was remanded by us to the Board of Immigration Appeal for consideration as to whether forceful IUD insertion would be persecution. Yes. All right. It's your position that that's not before us, right? Not before us. That's not a clean statement. It is. It isn't before you, Your Honor. In addition, that case was decided by another circuit, the Fourth Circuit, this year, in which they ruled that the insertion of an IUD and the fear of such an insertion is not persecution or a well-founded fear of persecution. So you're telling me there's a difference between the Fourth and the Ninth Circuit on an issue of law? The Ninth Circuit, I don't know. That comes as a surprise. I think we're bound by the Ninth. Certainly you are. But I'm saying the issue's been decided by a court, a sister circuit. The Ninth Circuit hasn't decided it. Oh, all right. Okay. I thought maybe they had gone directly opposite to it, which they have been known to do on occasion. I've heard of that. Didn't Jen decide that issue by remanding to the BIA to consider whether forceful insertion of an IUD would constitute persecution? Isn't that exactly the point that was sent back to the BIA? I suspect that the Court sent it back so that the Board could have the first interpretation, and apparently that's where it is at the moment. But your position here is that Ms. Zhao is not putting the issue of forceful insertion of IUD, but only forceful gynecological examination with its consequences. Is that correct? Yes, Your Honor. I think that's plain from the record. There was some mention made about fears the IUD, if the gynecological examination reveals that she's not a virgin, is that? I think that's what I heard her counsel argue. There's nothing in this record to indicate that if she's found not to be a virgin or thought not to be a virgin, that she has to wear an IUD. I thought that's what they were arguing.  But there's no evidence to support it is what you're saying. No. In fact, what's really another perplexity about the case is that she's talking about unmarried women when the alleged notice, which was not accepted and the fact finder found it dubious and suspectful, talks not only about unmarried youths, but married women without children, which is another contradiction because it's married women with children that they should be concerned about if any of this has any validity. Mr. Cuio, we frequently see this with administrative law judges. They will make a comment on the record, as this I.J. did, that, you know, I've got this notice here, and I quite don't know what to do with it because it doesn't look very regular to me. But then they don't go to the next step and say, I find it, based on my experience, to be an inherently incredible document, and I reject it as a fraud. And so I don't know what to do with it. It looks as if the judge is sort of musing on the record that, well, this is kind of an odd-looking exhibit, but then he never does anything with it, and he found her credible. So what do we do with that? Well, in this case, I think you take it as far as you can reasonably take it because if I find it ---- But you want me to take it the step that the I.J. didn't take it, which is to find that it is an inherently incredible document. She found it doubtful. It should not be given any weight whatsoever on review. But she did find it doubtful and unfortunately didn't sort of wrap it up. Well, this was the case, wasn't it? Was this the one where the alien presented herself at Honolulu? Yes. And there was a question as to whether she'd been smuggled in with false documentation. But, again, the judge doesn't do anything with that other than there's some reference to snake heads and that sort of thing, and then it sort of moved on to the ---- Well, the judge didn't use it, but there was no question in this case that it was a smuggling case, a snake head case, and a fraudulently obtained stolen passport. I may have ---- But we're stuck with what we have, which is the I.J. finds her not to be credible, and the BIA overrules that without any qualification. The BIA says we accept, we overrule the I.J. with respect to these findings but not with respect to those findings. So that's what, Your Honor, what I was getting to earlier when I said it's a unique case because what does the credibility here mean? It doesn't mean that much because what she's fearing, that is the particulars of what she's fearing, as she three times related, only came to her from her sister. And the fact finder did not give full weight to that sister's statement. She said it was reduced in probity value, of limited value, and to the extent she made that finding, that finding and the finding in regard to the notice were not challenged before the Board of Immigration Appeals. It's very frustrating, but we're not looking through the BIA's opinion here to the I.J.'s opinion because this is not a summary affirmance. We have an opinion by the BIA. It is, unfortunately, very short. No, Your Honor. No, this is a bravado type decision. Both decisions are under review. Both make the whole. This is not a summary affirmance. No, it is not. Under the bravado procedure, what preceded the summary affirmance, there's no language in this BIA decision whatsoever and no reference to the regulation for summary affirmance without opinion. None whatsoever. That's right. That's my point. So we're reviewing the decision of the BIA. We're not taking the I.J.'s decision as the BIA's decision. Yes, Your Honor. We are? Yes. Well, how can we do that when the BIA says we disagree with the I.J.'s adverse credibility findings? Under the bravado procedure, the board affirms the I.J. for the reasons the I.J. articulated with any additions or subtractions it wishes to add, and that's what happened here. The board subtracted on the credibility determination, leaving intact the other evidentiary findings in regard to the full acceptance of the three country reports and the Washington Post Foreign Service article, which the fact finder found persuasive, not persuasive, the petitioner's supporting material, and not fully accepting the sister statement and not believing the notice. And none of those findings was disturbed or challenged on appeal. So we have to sort of pick and choose, I guess, between what the I.J. determined and what the board? No, Your Honor.  The board sustained everything the I.J. did, except the credibility, and that's why I was saying it's unique, because what the petitioner is relying upon is from her sister, who was found not believable or acceptable. The only thing legally, after discounting the credibility, the only thing the board legally did was add one legal finding in regard to the fear. The I.J. had said the examination is not per se, as she expressed it, not per se persecution. The board did not disturb that. The board added its finding or ruling that this fear procedure is, under that second sentence in the amendment, it's not such resistance to population control as to be deemed persecution. So they fit. It makes a hole, and it's not otherwise. Counsel, I asked you a question once before. I want to ask the same question just one more time to make sure I've got your answer correct. If we disagree with you over how far the board has gone in overruling the I.J., and in light of Lee, is the appropriate thing for this court to do to remand to the attorney general for an exercise of discretion, as you suggested in footnote 53, or is it to remand to the board for reconsideration in light of Lee? Well, there was no discretion or determination in the case. No one got that far, because it was denied on the merits and on law. Narrowly speaking, the court could deny the petition on sufficiency of the evidence, period. But to go beyond that and say it's per se persecution would be ñ would require a finding this court has not made. I suppose the court could defer, if it wished, to the board to make that in the first instance, except that ñ I think that's what I understood. But I think that the ñ I need to be suggested. But the ñ but only because the board hasn't done it in a precedent decision. Right. The decision here is not precedent, but the I.J. made that determination, which the board accepted. But the board didn't have the benefit of the Ninth Circuit's decisions in Chen and Lee. That's correct, Your Honor. So wouldn't the prudent thing to do, if we don't accept your argument in full, be to simply remand it to the board to take another look as a record in light of those decisions? Yes, Your Honor. Okay. Thank you. Thank you. Just a couple of issues on the IUD. I think the government mischaracterized the testimony. In fact, she did testify to the fact that if she failed the fertility test for whatever reason, maybe from sports activity, she would be subject to IUD instruction, number one. Number two, the also testimony the mother told her that if you miss two consecutive inspection, that you also will have to wear the IUD. Another ñ go ahead. She ñ I actually would like to do a reading. She says, testifying truthfully, if IUD was inserted on me, the village people would think that I did something that's shameful and unvirtue, and no one would later marry me. And if I was sent back to China because I didn't go for the examination, they would force IUD on me. So very clearly, she believes that the IUD will be forced on her if she's returned. Okay. Go ahead. And another question is, I think the government is referring to the Washington Post article, Foreign Service Correspondent. Here, the information provided is saying that there are 32 counties right now has been implementing so-called options and choice in contraceptive methods. And it's all from government officials, Chinese government officials. However, when there's a non-profit organization in this country that went actually to those counties and interviewed the women involved, the women said, hey, abortion and sterilization by force is still going on. And that's the reason why we are not funding the U.N. for helping with that. And even at most, they said, 50 percent of the population maybe have some relaxation, and they're mostly in the big cities. And I think even that citation from the judge, if that is the issue. May I ask your colleague a question? You cited part of the transcript which shows some evidence of a bona fide subjective fear of persecution by insertion of an IUD. Where is the objective evidence? I think that's what counsel was commenting to as far as insufficiency of evidence. If all the evidence she has about her subjection to an IUD at a next examination is what her sister told her, is that sufficient for us to make a finding of fact? Your Honor, this is essentially an issue of corroboration evidence. She's testified truthfully and credibly, and now she has a responsibility to some extent to corroborate the evidence. But in this circuit, asylum may be granted simply on the basis of truthful, credible evidence. But does she have a foundational fact basis upon which to testify? Yes, she does. She wasn't there. It hasn't happened to her. She actually was there in the village, as we understand, when this happened to her sister. But she hasn't had the IUD forcibly inserted. No, she has not. But she knows what happens. And she's seen her sister's friend jump down a well when her unacceptable state of her hymen was announced publicly. She has experience in this that can't be denied. She lives there. But even if she can't corroborate this with State Department reports and things in the English language press, if her testimony is credible, that is enough. We believe that in the context of the inspections which are mentioned in the State Department reports of all childbearing-age women, that this makes sense. And she doesn't have to prove it by documentary evidence. She has to give the corroboration that she can come up with, but her testimony is sufficient. And that's the best we can do, Your Honor. And we recognize that. The truthful testimony of our client is really the foundation of this. All right. Thank you. And as for remand, yes, of course you can remand to the BIA. You don't have to, though, because we think the law is clear. You can grant this woman asylum right now. You could as a matter of deference to the BIA remand, but you don't have to. Doesn't Ventura pretty clearly restrict our authority and counsel that the preferred method, particularly where our case law has changed since the administrative agency made its determination, is to send it back for reconsideration in light of the legal guidance that we have now given? We seem to get into serious trouble with the Supreme Court when we decide to play immigration officer and asylum decision-maker. I think Ventura is a little different from this case. Ventura deals with actually there were submissions of changing country conditions. And after the — But we directed the result in Ventura. Correct. And that was a summary reversal with very strong language from the Supreme Court reminding Article III judges that we are not executive branch immigration officials and that the preferred method is to send it back to the agency with instructions, perhaps, but not to make the actual decision. But Ventura deals with whether there is a changing country condition. I understand that. But I'm — you know, when your wrist gets slapped, you remember the fact that you've been punished. And unless you can come up with something stronger — I understand your argument, but in light of Ventura, I'm not persuaded. Thank you, counsel. Thank you. The case just argued is submitted, and we'll get you a decision as soon as we can. The next case on the calendar, United States of America v. Jose Ceja Garcia. Good morning, Ms. Forsman. Good morning.
judges: Tallman, Bybee, Bea